DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

MOURAD BENHALIMA,

Appellant,

v.

ANASTASIIA IAKOVENKO,

Appellee.

No. 2D2025-2977

_____

July 29, 2026

Appeal from the Circuit Court for Hillsborough County; Cory Lee
Chandler, Judge.

J. Andrew Crawford of J. Andrew Crawford, P.A., St. Petersburg, for
Appellant.

Anastasiia Iakovenko, pro se.

MORRIS, Judge.

Mourad Benhalima appeals a final judgment of injunction for
protection against stalking violence entered in favor of Anastasiia
Iakovenko. Because we conclude that there was insufficient evidence to
prove stalking, we reverse.

BACKGROUND

Benhalima worked for Iakovenko for three years and dated her on and off for two years. The relationship ended, and Benhalima began a relationship with another woman, Paulina Goldstein. What happened after is the basis for Iakovenko's petition for injunction for protection against stalking.

In her petition, Iakovenko asserted that Benhalima and Goldstein were creating fake online accounts which they used to post negative and false reviews about her business and personal life. She claimed that Benhalima was "spreading fake information" at least three times a day and that he stole client information and spread false information to her clients. Attached to the petition were screenshots from Facebook that appeared to depict disparaging remarks and comments about Iakovenko's business. The trial court issued a temporary injunction.

At the return hearing, Iakovenko described what had been said about her. She testified that Benhalima had access to her entire database of clients and that he created multiple fake online accounts for purposes of spreading false information. She asserted that he had contacted more than 400 of her clients. She testified that he called her and told her he hated her and that she could hear Goldstein in the background "yelling horrible words." She testified that one of the fake online accounts stated that she was in the country illegally, that another fake online account contacted and told her daughter that Iakovenko was a prostitute, and that another fake online account contacted and told one of her friends that Iakovenko was a pedophile engaged in human trafficking. This resulted in her Facebook account being suspended. She presented copies of negative reviews of her business from accounts which appeared to be other individuals besides Benhalima or Goldstein. She maintained that she knew Benhalima was involved because some of

2

the fake online accounts asked about him in private messages sent to her and because there was "confidential information that was accessible only to him." She presented the court with copies of Facebook messages that depicted what appeared to be a mugshot of her, but when the trial court inquired how she knew that they were created by Benhalima, she did not respond. She testified that one of the fake online accounts purported to be a Polish attorney,[1] but she conceded she did not know if it was a man or a woman. She presented the court with a photo which she claimed depicted Benhalima's account wherein he stated that she was a scammer.

Iakovenko also asserted that Goldstein assisted Benhalima in writing about and asking about Iakovenko online[2] with a picture of Iakovenko's alleged mugshot.

In his response, Benhalima testified that the problems started when Goldstein learned of Benhalima's prior relationship with Iakovenko. He testified that Goldstein asked him to call Iakovenko and ask her to stop contacting Benhalima. Goldstein also asked Benhalima to send disparaging text messages to Iakovenko; Goldstein told Benhalima that she wanted to "hurt" Iakovenko. Benhalima told Goldstein that he did not want to send Iakovenko the text messages and that Goldstein was being manipulative. Benhalima also told Goldstein that it was "straight up wrong." Initially, Benhalima refused to send the requested messages to Iakovenko, but he eventually relented and sent messages to her via Facebook Messenger. This testimony is supported by screenshots of

---

[1] Goldstein is Polish so Iakovenko's presentation of testimony and evidence about the fake online accounts appearing to be from people of the same ethnicity or within Poland presumably was to prove that Benhalima and Goldstein were behind the fake online accounts.

[2] This was presumably on Iakovenko's Facebook account.

WhatsApp messages between Benhalima and Goldstein. Benhalima maintained that he only sent the messages after intense pressure from Goldstein. The exhibits indicate that the first mean message was sent on August 15, 2025. That same day, he texted Iakovenko, apologizing for the Facebook message, saying that he did not mean it and that his girlfriend (Goldstein) was insane. He ended the message by saying, "I hope you are doing well."

According to Benhalima, Goldstein discovered the apology messages and became upset. After Benhalima told her that he wanted to end the relationship, Goldstein attempted suicide. Benhalima testified that he then again sent more disparaging messages to Iakovenko, asserting that he did so because Goldstein was in a "fragile state" and she had asked him to do so. The exhibits indicate that the three additional mean messages were sent on August 16, 2025. Benhalima insisted that he had no malice or intent to harass Iakovenko and that, instead, he only did so because of "emotional coercion" and concern for Goldstein. He maintained that he "ha[d] nothing against" Iakovenko.

At one point, Benhalima ended his relationship with Goldstein. However, they later reconciled. Benhalima claimed that Goldstein asked him to leak Iakovenko's client information; this is supported by a screenshot of a WhatsApp message. Benhalima refused to do so. Benhalima claimed that Goldstein took his phone and stole some of Iakovenko's client information. Benhalima asserted that Goldstein then began engaging in online efforts to harass Iakovenko.

The record before this court does not reflect that Iakovenko presented any messages, call logs, metadata, account records, or testimony from any of her clients to support her argument that it was Benhalima who contacted her clients. There was no testimony,

4

metadata, or technical evidence linking Benhalima to the fake online accounts. While one screenshot appears to reflect that someone with Benhalima's name posted a negative review, Iakovenko did not provide anything establishing that the account profile—which did not depict Benhalima but instead depicted a cat—legitimately belonged to Benhalima. Some of the messages reflect that they came from Goldstein's account, and some have the name "Paulina" attached to them. Some of the messages also referred to Benhalima in the third person, with such threats as, "Should I post messages you kept sending to Mourad when he broke up with you?" Goldstein's messages to Benhalima and Iakovenko's friend and the messages from the fake online accounts shared similar spelling and vocabulary errors and grammatical patterns. One of the fake reviews was translated from Polish to English. Benhalima presented multiple exhibits reflecting that he only sent Iakovenko a few messages on two separate days.

Ultimately, the trial court rejected Benhalima's arguments (1) that he was not responsible for any of the conduct apart from his personal derogatory messages and (2) that it was Goldstein who engaged in the repeated online harassment. The trial court entered a five-year injunction but did so without making any factual findings. After the trial court ruled, Benhalima attempted to present further arguments, but the trial court cut him off, advising him, "I wouldn't speak anymore, sir." Benhalima continued to assert that there was insufficient evidence to prove that he was behind the fake online accounts. The trial court disagreed, relying on Benhalima's admission to sending the personal derogatory messages on two separate occasions. Benhalima again continued to make arguments, but the trial court stopped him and told

5

him that the decision was made. The trial court ended the hearing and later entered the order on appeal.

ANALYSIS

"On appeal of an order granting a permanent injunction for protection against stalking, the trial court's factual findings are reviewed for competent substantial evidence." *Stallings v. Bernard*, 334 So. 3d 365, 367 (Fla. 2d DCA 2022) (citing *Washington v. Brown*, 300 So. 3d 338, 340 (Fla. 2d DCA 2020)). "But the question of whether the evidence is legally sufficient to justify imposing an injunction is a question of law that we review de novo." *Id.* (quoting *Washington*, 300 So. 3d at 340).

A person who is a victim of stalking, including cyberstalking, may seek an injunction for protection against stalking under section 784.0485, Florida Statutes (2025). Pursuant to section 784.048(2), "[a] person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking." *See also Stallings*, 334 So. 3d at 367-68. " 'Harass' means to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." § 784.048(1)(a). A "[c]ourse of conduct" is defined as "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose." § 784.048(1)(b); *see also Cash v. Gagnon*, 306 So. 3d 106, 109 (Fla. 4th DCA 2020) ("A course of conduct requires multiple acts that are separated by time or distance.").

Stalking can include cyberstalking. § 784.048(2). "Cyberstalk" means "[t]o engage in a course of conduct to communicate, or to cause to be communicated, directly or indirectly, words, images, or language by or through the use of electronic mail or electronic communication, directed

6

at or pertaining to a specific person." § 784.048(1)(d)1.  Cyberstalking constitutes harassment through electronic communication.  *Scott v. Blum*, 191 So. 3d 502, 504 (Fla. 2d DCA 2016); *Murphy v. Reynolds*, 55 So. 3d 716, 717 (Fla. 1st DCA 2011).  "In order to succeed in a petition for injunction against cyberstalking, the petitioner must establish that a series of electronic communications directed at [or pertaining to] the petitioner caused substantial emotional distress and served no legitimate purpose."  *Scott*, 191 So. 3d at 504.

"Whether a communication causes substantial emotional distress should be narrowly construed and is governed by the reasonable person standard."  *David v. Textor*, 189 So. 3d 871, 875 (Fla. 4th DCA 2016); *see also Washington*, 300 So. 3d at 341; *Craft v. Fuller*, 298 So. 3d 99, 104 (Fla. 2d DCA 2020); *Scott*, 191 So. 3d at 504; *Leach v. Kersey*, 162 So. 3d 1104, 1106 (Fla. 2d DCA 2015).  Ordinary feelings of distress or embarrassment are not sufficient to constitute substantial emotional distress.  *See Craft*, 298 So. 3d at 104 (quoting *Venn v. Fowlkes*, 257 So. 3d 622, 624 (Fla. 1st DCA 2018)).  "[T]he bar for establishing that a reasonable person would suffer substantial emotional distress is set fairly high."  *Id.*

This court has recognized that emails, articles, blog posts, and videos that contain false allegations or embarrassing information are not sufficient for purposes of imposing a cyberstalking injunction because a reasonable person would not feel substantial emotional distress.  *See Scott*, 191 So. 3d at 505.  Distress relating to a person's business reputation and personal reputation among colleagues does not rise to the level of substantial emotional distress.  *Id.*  "Mere irritation, annoyance, embarrassment, exasperation, aggravation, and frustration, without more, does not equate to 'substantial emotional distress.' "  *Garcia v.*

*Soto,* 337 So. 3d 355, 360 (Fla. 4th DCA 2022) (quoting *Johnstone v. State,* 298 So. 3d 660, 669 (Fla. 4th DCA 2020) (Klingensmith, J., dissenting)).

Angry social media messages have been found to generally be insufficient to support the issuance of injunctions. *See Scott,* 191 So. 3d at 505 (citing *Chevaldina v. R.K./FL Mgmt., Inc.,* 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014)). Similarly, "unpleasant," "uncivil," and "distasteful . . . communications do not rise to the level required to support a permanent injunction against stalking." *Reid v. Sanders*, 282 So. 3d 151, 151 (Fla. 1st DCA 2019).

Here, we first conclude that the evidence was insufficient to connect Benhalima to the messages and poor reviews sent from the fake online accounts. While Benhalima admitted that he personally sent derogatory messages to Iakovenko on two occasions, he denied being involved in any of the messages sent from the fake online accounts to Iakovenko, her daughter, and her friend. He also denied any involvement in the poor business reviews left by the fake online accounts. As noted previously herein, while one of the poor business reviews appeared to have come from a Facebook profile bearing Benhalima's name, Iakovenko presented nothing to establish that the profile did, in fact, belong to Benhalima. There was no evidence that he created any of the fake online accounts or that he contacted any of Iakovenko's clients. Iakovenko's conclusory assertion on that point is insufficient. *See Walker v. Harley-Anderson,* 301 So. 3d 299, 302 (Fla. 4th DCA 2020) ("Testimony that a person received a text or email from another is not sufficient, by itself, to authenticate the identity of the sender." (quoting Charles W. Ehrhardt, 1 *West's Fla. Prac. Series* § 901.1a (2020 ed.))).

8

In addition, the messages that are linked to Benhalima personally do not amount to stalking for two reasons. First, a reasonable person in Iakovenko's position would not have suffered substantial emotional distress. Benhalima sent a total of four mean and disparaging Facebook messages to Iakovenko within a two-day period.[3] After the first message, he sent a text apologizing to Iakovenko, essentially blaming it on his "insane" girlfriend. But then he sent the other three Facebook messages the next day. These offensive or upsetting messages from an ex-boyfriend would not have caused a reasonable person substantial emotional distress. *See Washington*, 300 So. 3d at 341 (" '[S]ubstantial emotional distress' connotes an unjustifiable infliction of stress of great proportion, in the nature of fear and concern. Simply evoking mere resentment and anger, without more, does not qualify for entry of an injunction."); *Carvajal v. Ferretti*, 51 Fla. L. Weekly D890, D894 (Fla. 4th DCA Apr. 29, 2026) ("The record reflects insults, accusations, and disparaging social media posts, namely being called a 'psychopath,' a 'stalker,' or an 'abuser,' and being criticized publicly. While such statements are undoubtedly offensive and may be embarrassing or upsetting, Florida courts have repeatedly held, as stated above, that this type of speech does not rise to the level of causing substantial emotional distress.").

Second, the messages sent by Benhalima personally to Iakovenko do not constitute repeated harassment or cyberstalking under section 784.048(2). Assuming, without deciding, that these messages constitute a "course of conduct" because they are two or more acts over a period of time, however short, *see* § 784.048(1)(b), they constitute only one

---

[3] Benhalima disparaged her age, appearance, and nationality and said things such as he never loved her and had only used her.

incident of harassment or cyberstalking and are insufficient to show that Benhalima "repeatedly" harassed or cyberstalked as required by section 784.048(2). *See Carter v. Malken*, 207 So. 3d 891, 894 (Fla. 4th DCA 2017) ("A minimum of two incidents of harassment are required to establish stalking." (citing *Wyandt v. Voccio*, 148 So. 3d 543, 544 (Fla. 2d DCA 2014)); *see also Pickett v. Copeland*, 236 So. 3d 1142, 1145 (Fla. 1st DCA 2018) ("[A] single 'stalking' offense requires *repeated* acts of malicious following, and/or harassment, and/or cyberstalking.").

For these reasons, we reverse the final judgment of injunction for protection against stalking violence.[4]

Reversed.

LaROSE and SLEET, JJ., Concur.

_____

Opinion subject to revision prior to official publication.

_____

[4] The record also indicates that after Iakovenko completed her self-direct examination, the trial court immediately asked Benhalima for his response instead of inquiring if he wanted to cross-examine Iakovenko. This issue, however, is not properly before this court in this appeal as Benhalima did not preserve this issue by contemporaneous objection and has not raised it on appeal as fundamental error. *See Rachkov v. Medvednik*, 432 So. 3d 658, 660 n.3 (Fla. 2d DCA 2026) ("[E]ven fundamental error must be raised on appeal . . . ."). Nevertheless, we caution the trial court to adhere to the dictates of section 784.0485(5)(c), requiring a full hearing before an injunction may be entered.